# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ONE2ONE COMMUNICATIONS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-27311 (NLW) |
| QUAD/GRAPHICS, INC.<br><br>Appellant,<br><br>v.<br><br>ONE2ONE COMMUNICATIONS, LLC,<br><br>Appellee/Debtor. | *Bankruptcy Appeal*<br><br>Civil Docket No. 1:13-cv-1675 (JLL) |

---

## QUAD'S MEMORANDUM OF LAW IN OPPOSITION TO REORGANIZED DEBTOR'S MOTION TO DISMISS APPEALS AS EQUITABLY MOOT

ASHFORD – SCHAEL LLC
Courtney A. Schael, Esq.
1371 Morris Avenue
Union, NJ  07083
Westfield, NJ  07090
(908) 232-5566
Counsel for Appellant, Quad/Graphics, Inc.
-and-

GODFREY & KAHN, S.C.

Timothy F. Nixon, Esq. (WI Bar No. 1013753)
Counsel for Appellant, Quad/Graphics, Inc.

Dated:  June 14, 2013

## PRELIMINARY STATEMENT

Appellant, Quad/Graphics, Inc. ("Appellant" or "Quad") submits the memorandum of law in opposition to the Reorganized Debtor's Motion to Dismiss Appeals as Equitably Moot (the "Motion").  Under the Debtor's interpretation of the equitable mootness doctrine, the narrow and limited exception to this Court's obligation to exercise jurisdiction over a bankruptcy appeal would become the rule and all appeals of confirmation orders would be rendered equitably moot.  Such an expansion of the doctrine is both unconstitutional and contrary to binding Third Circuit precedent limiting the application of the doctrine to narrow circumstances arising in large complex Chapter 11 reorganizations.

The Debtor's Chapter 11 reorganization is straightforward and uncomplicated—the antithesis of the "mega" cases in which the Third Circuit has applied the narrow exception to appellate review.  Expanding the narrow exception to dismiss appeals of confirmation orders entered in even the smallest and mundane bankruptcy cases, such as the Debtor's, unconstitutionally vests a non-Article III bankruptcy court with the authority to enter final non-appealable orders in contravention to the carefully drafted jurisdictional provisions delineating the boundaries of non-Article III bankruptcy courts' powers and authority.  This Court should summarily reject the Debtor's request that this Court ignore its obligation to exercise its jurisdiction as an Article III Court to review on appeal the Bankruptcy

1

Court's Order confirming the Debtor's Plan.

## STATEMENT OF FACTS[1]

### A.    The Debtor's Bankruptcy Case is Not Large or Complex

The Debtor is not a large complex corporation nor is the Bankruptcy Case[2] a large complex Chapter 11 reorganization.  The Debtor is a single member limited liability company.  The Debtor has one business location in Wheeling, Illinois.  (*See* dkt. no. 206 at p. 8).[3]  Although the Debtor provided a New Jersey address of 213 Bear Creek Road, Andover, New Jersey, in its Petition and maintains that this is the location of its business "headquarters,"[4] this is actually the home address of Michael Sweeney, the Debtor's Chief Financial Officer.  Mr. Sweeney also does work for other companies out of his home for other businesses, wholly unrelated to the Debtor or its principals.  Bruce Heverly, the Chief Executive Officer of the Debtor and Joanne Heverly, the President of the Debtor, work out of their marital home in New Jersey.

The Debtor only has 28 regular employees including the Heverly family members.  (*See id*. at  p. 9).  Contrary to its claim that hundreds of jobs

---

[1] For its Statement of Facts, Appellant relies on, and incorporates herein, the Statement of Facts in Appellant's Opening Appeal Brief (the "Appellant's Brief") (District Court docket no. 29) as supplemented herein.

[2] Capitalized terms not defined herein have the meanings set forth in Appellant's Opening Appeal Brief (District Court docket no. 29).

[3] Unless otherwise noted, "dkt. no. ___" refers to docket numbers in the Bankruptcy Case.

[4] (*See* dkt. no 206 at p. 9).

were at stake if the Plan was not confirmed, the Debtor failed to produce any evidence substantiating such a claim.  As set forth in the Disclosure Statement, to arrive at the alleged "hundreds of jobs," the Debtor added to its 28 regular employees, 12 temporary independent contractors used by the Debtor and individuals employed by other companies such as IBM factory maintenance personnel.  (*See id*.).  The Debtor did not present any evidence during the Confirmation Hearing that IBM or any of the other large corporations who provide services to the Debtor would terminate these trained employees if the Debtor's Plan was not confirmed (and the Debtor closed down) rather than simply redeploying the personnel to an alternative location or customer.

The Debtor's Petition and Schedules list assets in the amount of $354,088.47.  (*See* dkt. no 1).  The Debtor's unsecured claims, not including Appellant's claim and insider claims, total less than $1.3 million.  (*See id*.).

For the three years preceding the Petition Date, the Debtor reported total net losses of $635,297:  in 2009 ($612,717 net loss); in 2010 ($43,756 net gain); in 2011 ($66,336 net loss).[5]  (*See* CQ-117 at Appendix M, N and O).  The Debtor's gross profit prior to the Petition Date never exceeded $4.5 million.  (*See id*.)  In 2009, the Debtor's gross profit was approximately $3.25 million.  (*See id*.)

---

[5] As reported on the tax returns filed by sole member of the Debtor, Joli, Inc.  (*See* CQ-117 at Appendix M, N and O).

**B.      The Debtor's Plan is Not Complex and Does Not Involve <u>Any</u>
<u>Intricate Transactions</u>**

          The transactions under the Plan are few and straightforward. The Plan

provides for the Plan Sponsor to acquire 100% of the membership interests in the

Reorganized Debtor in exchange for $200,000 cash ("Sponsor Investment").  (*See*

dkt. no 206 at Exhibit A, pp. 17-20).  Neither the Plan Sponsor nor any third party

is contributing any additional capital to fund the Plan.

          The payments to creditors under the Plan are coming from the

Reorganized Debtor, not the Plan Sponsor.  (*See id*. at p. 17).  Any implication that

the Plan Sponsor is somehow assuming the obligations of the Reorganized Debtor

is legally and factually incorrect.  As a matter of law, members of limited liability

companies are only liable to the extent of their capital investment.  Further, the

Plan Sponsor insisted on (and received) a release from any liability, which request

was approved by the Bankruptcy Court over Appellant's objections.

          The Plan also provides that the Creditors' Committee is dissolved as

of the Effective Date of the Plan (s*ee* dkt. no. 206 at Exhibit A, p. 20, ¶ 9) and that

promissory notes, indentures, share certificates, options, warrants, and other

instruments will be deemed cancelled and null and void without further action by

the Reorganized Debtor (*see id*. at p. 19, ¶ 7).  Finally, the Reorganized Debtor will

have a Board of Managers, composed of one or more Managers (*see* dkt no. 206 at

Exhibit I,  ¶ 4.1), however, the officers of the Reorganized Debtor remain the same

(*see* dkt. no. 206 at Exhibit I, ¶ 4.11(a)).

Even more significant than the "transactions" under the Plan purportedly closed by the Debtor, is what the Plan does not change or otherwise require. Specifically, the Plan does not provide for any of the following:

i   The Reorganized Debtor is <u>not</u> issuing any publically traded stock or debt instruments;

ii   The Reorganized Debtor is <u>not</u> obtaining any new financing;

iii   The Reorganized Debtor is <u>not</u> changing its name (*see* dkt no. 206 at Exhibit I, ¶ 1.2);

iv   The Reorganized Debtor is <u>not</u> changing its principal place of business (*see id*. at Exhibit I, ¶ 1.4);

v   The Reorganized Debtor is <u>not</u> changing its registered agent (*see id*.);

vi   The Reorganized Debtor is <u>not</u> changing its officers (*see id* at Exhibit I, ¶ 4.11(a));[6]

vii   The Reorganized Debtor will <u>continue</u>, as the Debtor has always done, to pay the costs of maintenance and repair for the equipment owned by Joanne Heverly through Joli, Inc.;[7] and

---

[6] Bruce Heverly continues in his position as the Chief Executive Officer. Joanne Heverly's title changes from President to Vice President of Administration but keeps the same duties as before. Tom Mason continues as the Vice President of Operations. (*See id*. at Exhibit I, ¶ 4.11(a)).

[7] Joli, Inc. is sole owner of Assets Holding Corporation ("AHC"). The Reorganized Debtor is entering into an Equipment Lease Agreement with Asset Holding Corporation for rent in the amount of the cost of repair and maintenance of the rented equipment. (*See id*. at Exhibit G, ¶ 3). This is a continuation of the Debtor's pre-confirmation practice—the Debtor has always paid AHC's expenses. (*See id*. at p. 6).

      viii    The Reorganized Debtor is <u>not</u> increasing the Heverlys' combined salaries.[8]

## C.   <u>Procedural History</u>

On or about February 28, 2013, Quad filed a motion for stay pending appeal to protect its rights if the Bankruptcy Court entered an order confirming the Plan that was not subject to the automatic 14 day stay provided for in Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 7062(a).  (*See* Notice of Motion by Quad/Graphics, Inc. for Stay Pending Appeal (dkt. no. 258)).

On March 4, 2013, the Bankruptcy Court continued the hearing on confirmation and confirmed the Debtor's Plan.  The Bankruptcy Court also denied Quad's motion for a stay pending appeal.  The following day, the Bankruptcy Court entered the Order Confirming Debtor's Fourth Amended Plan of Reorganization (the "Confirmation Order") (dkt. no. 271) and the Order Denying Motion for Stay Pending Appeal (dkt. no. 277).

On March 18, 2013, Quad timely filed a Notice of Appeal of the Confirmation Order (*see* dkt. no. 290, Notice of Appeal of Confirmation Order with appealed order attached) and a Notice of Appeal of the Order Denying Motion

---

[8] The Plan provides for One2One Communications, LLC to enter into Employment Agreements with Bruce Heverly and Joanne Heverly that reallocates Joanne Heverly's $300,000 annual salary between them so that Bruce Heverly earns $195,000 annually and Joanne Heverly earns $105,000 annually.  (*See id.* at Exhibit E, ¶¶ 3(a) and 4(a) in each agreement).

for Stay (*see* dkt. no 291, Notice of Appeal of Order Denying Stay with appealed order attached) (collectively, the "Appeal").

The following day, Quad filed an Emergency Application for Entry of Temporary Stay of Confirmation Order and Order to Show Cause and Motion for Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 of Order Confirming Debtor's Fourth Amended Chapter 11 Plan of Reorganization or, Alternatively, for Determination that Substantial Consummation of Fourth Amended Plan Will Not Equitably Moot Appeal and Enjoining Certain Actions by Reorganized Debtor (the "Motion for Stay") (District Court docket no. 1).

On that same date, the Debtor filed its opposition to Quad's Motion for Stay (District Court docket no. 2).  Later that day, the Court heard oral argument and reserved decision.

On March 20, 2013, the Debtor filed supplemental opposition to Quad's Motion for Stay.  (*See* District Court docket no. 3).  Later on March 20, 2013, the Court entered an Order, denying Quad's request for a stay and denying as premature Quad's request that the Court determine equitable mootness and enjoin certain actions of the Debtor (the "Order Denying Stay").  (*See* District Court docket no. 5).  The Court noted in the Order Denying Stay that "Appellant has preserved the right to reassert its arguments once the issue is ripe for judicial determination."  (*See id*.).

On March 20, 2013, Quad filed a Notice of Appeal to the Third Circuit Court of Appeals of the Order Denying Stay (the "Third Circuit Appeal") (District Court docket no. 6, as amended by District Court docket no. 7).  Quad also filed an Emergency Verified Application by Appellant Quad/Graphics, Inc. for Entry of: (i) Emergency Order Temporarily Staying Confirmation Order and (ii) Order to Show Cause for Reversal of District Court's Order Denying Quad's Motion for Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 of Order Confirming the Debtor's Fourth Amended Chapter 11 Plan of Reorganization and Denying Quad's Motion for a Determination that Substantial Consummation of Fourth Amended Plan Will Not Equitably Moot Appeal and Enjoining Certain Actions by Reorganized Debtor (the "Third Circuit Motion").  (Assigned case no. 13-1789).

On March 21, 2013, at approximately 12:30 p.m., the Debtor filed a Notice of Appearance in the Third Circuit Appeal and a Brief in Opposition to Appellant's Third Circuit Motion.  Later that day, the Debtor also filed a Notice of Closing of Transactions Contemplated by the Debtor's Fourth Amended Plan of Reorganization (the "Notice") in the Third Circuit Appeal.  (*See* Emergency Application at Exhibit A).  According to the Notice, the Debtor "closed the transactions with One2One Holdings, LLC, the Plan Sponsor, contemplated by the Debtor's Fourth Amended Plan of Reorganization (the 'Plan') and commenced

distributions under the Plan on March 21, 2013." (*See id*. at Exhibit A).  Finally, on March 21, 2013, the Debtor hand delivered a check to counsel for Quad in the amount of $17,104.00.  (*See id*. at ¶ 13).

On March 21, 2013, the Circuit Court issued an Order denying the Third Circuit Motion for lack of jurisdiction (the "Third Circuit Order") (docket no. 9).  The Circuit Court further ruled that even if it had jurisdiction, the Circuit Court would deny the Third Circuit Motion in significant part for the reasons given by the District Court.

After the Debtor served notice that it had closed the transactions under the Plan, Quad filed an Order to Show Cause for injunctive relief with this Court. The Court held a hearing and denied Quad's motion determining, in part, that the Third Circuit had already determined the issue on Quad's appeal of this Court's Order denying a stay pending appeal.

After Quad filed its opening appeal brief and the Debtor filed its appeal brief, the Debtor filed its Motion seeking dismissal of the Appeal.  Quad submits this memorandum of law in opposition to the Motion along with the Certification of Courtney A. Schael, Esq. in Opposition to Reorganized Debtor's Motion to Dismiss Appeals as Equitably Moot (the "Schael Certification").

## LEGAL ARGUMENT

### POINT ONE
### THIS COURT SHOULD NOT EXPAND THE DOCTRINE OF EQUITABLE MOOTNESS BEYOND THE THIRD CIRCUIT'S LIMITED APPLICATION OF THE DOCTRINE TO LARGE COMPLEX CHAPTER 11 REORGANIZATIONS.

The Debtor urges this Court to ignore the Third Circuit's binding decisions limiting the application of the doctrine of equitable mootness to appeals in large complex Chapter 11 reorganizations and determine that Quad's Appeal is equitable moot. When the equitable mootness doctrine is applied to a bankruptcy appeal, the appellate court does not decide the merits of the appeal notwithstanding its jurisdiction to hear an appeal. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012) ("Equitable mootness is a way for an appellate court to avoid deciding the merits of [a bankruptcy] appeal."). The Debtor requests that this Court abandon its 'virtually unflagging obligation' to exercise . . . jurisdiction" over the pending Appeal under the doctrine of equitable mootness. *U.S. Trustee v. Unofficial Committee of Equity Security Holders* (*In re Zenith Electronics Corp*.), 329 F.3d 338, 347 (3d Cir. 2003) (*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). However, the doctrine of equitable mootness is only "a very limited and well defined" exception to the general rule that a court should exercise its jurisdiction to hear an appeal and does not apply to this Appeal. *See Id*.

The Third Circuit recently reiterated that the doctrine of equitable mootness is to be applied with caution and is limited in scope.  *In re Philadelphia Newspapers*, 690 F.3d at 171 (citations omitted).  The Third Circuit directed that:

> Taken together, these factors recognize that a court <u>only</u> should apply the equitable mootness doctrine if doing so will "unscrambl[e] <u>complex</u> bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *Nordhoff Invs., 258 F.3d at 185*.

*Id*. at 170 (emphasis added).  Under the Third Circuit's holding in *In re Philadelphia Newspapers* and earlier precedent, determining whether the bankruptcy reorganization is complex is a prerequisite to applying the doctrine of equitable mootness.

The Third Circuit has upheld the application of equitable mootness to appeals of confirmation orders in "mega" bankruptcy cases that dwarf the Debtor's Bankruptcy Case.  None of the cases cited by the Debtor in which a court determined an appeal of a confirmation order was equitably moot[9] involved a

---

[9] The Debtor relies on various cases in which the courts considered whether appeals from orders, other confirmation orders, were equitable moot.  *See e.g. Estate of Asman v. Old Bridge Chemicals, Inc*., 2006 WL 2990366 (D.N.J. Oct. 18, 2006);  *Ad Hoc Comm. of Class 7 Creditors v. Northwestern Corp.* (*In re Northwestern Corp*.), No. 08-513, 2009 WL 2399120 (D. Del. Aug. 4, 2009).  These cases are distinguishable because the court did not address equitable mootness of an appeal of an order confirming a chapter 11 plan.  Further, in some of these cases, the parties actually failed to appeal a related confirmation order and/or failed to seek a stay pending appeal.  *See e.g. Asman*, 2006 WL 2990366 (D.N.J. Oct. 18, 2006).

bankruptcy reorganization or Chapter 11 plan that is remotely comparable to the Debtor's simplistic reorganization and Plan.

All of the cases cited by the Debtor in which courts applied the equitable mootness doctrine to an appeal of a confirmation order involved indisputably complex and large bankruptcy reorganizations. As set forth below, these complex and large bankruptcy reorganizations included multiple related debtors, hundreds of millions of dollars in assets, liabilities and claims, and hundred to thousands of creditors. In addition, these debtors' chapter 11 reorganizations and plans shared common characteristics, such as, publicly traded debt and securities, borrowing hundreds of millions of dollars, and similar characteristics, for example:

(a) *ACC Bondholder Group v. Adelphia Communications Corp.* (*In re Adelphia Communications Corp.*), 367 B.R. 84 (S.D.N.Y. 2007).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $100 Million

Liabilities—over $100 Million

Creditors—over 1000

PLAN (*see Adelphia Communications Corp.*, 367 B.R. at 90):

Over $6.49 billion in cash distributed to more than 8,000 creditors

Over 117 million of <u>publicly traded shares of common stock distributed to approximately 13,500 creditors</u>

More than 9.56 billion of publicly traded interests distributed to more than 31,000 creditors and equity interests

(b) *Ad Hoc Comm. of Convertible Noteholders v. Spansion, Inc.* (*In re Spansion, Inc.*), Nos. 10-369, 10-385, 2011 U.S. Dist. LEXIS 86152 (D. Del. Aug. 4, 2011).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $1 Billion

Liabilities—over $1 Billion

Creditors—1,000 to 5,000

PLAN (*see Spansion, Inc.*, 2011 U.S. Dist. LEXIS at *10):

Public offering of 6.750 million shares of new common stock

Granted options to purchase 3,033,931 shares of new common stock

Completed a rights offering with $109 million cash proceeds

Closure of a credit facility with cash proceeds of over $425 million

Payment of over $633 million to pre-petition senior noteholders

Cancellation of pre-petition stock and notes and issuance of $200 million in unsecured notes

Repayment of $200 million credit facility

(c) *Campania Int'l Financiera S.A. v. Calpine Corp.* (*In re Calpine Corp.*), 390 B.R. 508 (S.D.N.Y. 2008).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $100 Million

Liabilities—over $100 Million

Creditors—100-199

PLAN (*see Calpine Corp., 390 B.R. at _____*):

(d)    *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996).

PETITION (not available)

PLAN (*see Continental Airlines*, 91 F.3d 553):

Merger of 53 debtors into and with Continental

$110 million investment in the reorganized debtor

Transfer by foreign governments of route authorities

Assumption of leases and executory contracts worth over $5 billion

(e)    *In re SemCrude L.P.*, 456 F. App'x 167, 2012 WL 8597 (3d Cir. 2012) (not precedential); *Luke Oil Co. v. SemCrude, L.P.* (*In re SemCrude, L.P.*), No. 09-cv-994, 2012 WL 1836353 (D. Del. May 21, 2012).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $1 Billion

Liabilities—over $1 Billion

Creditors—1,000-5,000

PLAN (*see SemCrude, L.P.*, 2012 WL 1836353):

Multiple related debtors

Reorganized debtors had distributed "hundreds of millions of dollars to their pre-petition creditors"

"reorganization involved intricate transactions"

creditor did not seek a stay from the bankruptcy court or any other court

14

<u>Publically traded stocks and warrants</u> issued as part of consummation of the plan and parties holding them would be affected by appeal

Obtained financing post-consummation without including that liability subject to the appeal

(f)   *Korth v. Dura Automotive Sys., Inc.* (*In re Dura Automotive Sys., Inc.*), 403 B.R. 300 (D. Del. 2009).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $100 Million

Liabilities—over $100 Million

Creditors—over 100,000

PLAN (*see Dura Automotive*, 403 B.R. at 304-305):

Issuance of tens of millions shares of stock to various creditor classes

Obtaining financing of $135 million with syndicate of lenders

Sale of substantially all of affiliates' assets

(g)   *R2 Invs., LDC v. Charter Communications, Inc.* (*In re Charter Communications, Inc.*), 691 F.3d 476 (2d Cir. 2012).

PETITION (*see* Schael Certification at Exhibit A):

Assets—over $100 Billion

Liabilities—over $100 Billion

Creditors—50,001 to 100,000

In contrast to these "mega" bankruptcy cases involving multiple related debtors and hundreds of millions of dollars, the Debtor's Bankruptcy Case involved only one debtor, assets of only $354,088.47 and total unsecured claims,

not including Appellant's claim and insider claims of less than $1.3 million.  (*See* dkt. no 1).  The Debtor had only one secured creditor with a blanket lien on the Debtor's assets and this secured creditor's claim was less than $100,000.  (*See id*.). The Debtor only had 17 unsecured creditors not including insiders.  It is indisputable that the Debtor's Bankruptcy Case was not large or complex.

Similarly, it is indisputable that the Debtor's Plan was not complex and did not involve intricate transactions.  As set forth in detail *supra*, the Plan provided for the automatic cancellation of the sole member's interest without further action by the Reorganized Debtor and issuance of new equity to the sole new member.  The Debtor's Plan is in stark contrast to the cases cited by the Debtor which involved the issuance of hundreds of millions of shares of publically traded common stock and/or debt to tens of thousands of creditors and/or interest holders.  The Debtor's Plan did not provide for any new financing, any mergers or dissolutions of entities, any change in management or any other significant transactions.  Further, the Debtor's Plan did not provide for a name change, change of business location or any other changes that would delineate to third parties between the debtor-in-possession and the Reorganized Debtor.

The relief requested by the Debtor is contrary to Third Circuit precedent limiting the application of the doctrine of equitable mootness to large complex bankruptcy cases.  The Debtor improperly requests that this Court ignore

binding precedent and expand the doctrine beyond the boundaries delineated by Third Circuit.  Neither the Debtor's reorganization nor its Plan are large and complex and, therefore, this Court should deny the Debtor's Motion.

**POINT II**

**THE DOCTRINE OF EQUITABLE MOOTNESS IS UNCONSTITUTIONAL BECAUSE IT VESTS NON-ARTICLE III COURTS WITH THE ABILITY TO <u>RENDER FINAL NON-APPEALABLE ORDERS.</u>**

**A.     An Article III Court Cannot Decline to Review a Bankruptcy Appeal**

There are fundamental constitutional issues raised when an Article III court refuses to hear appeals from non-Article III bankruptcy courts in the name of "equitable mootness."  The Supreme Court's grudging approval of non-Article III adjudication rests on whether Article III courts still retain "essential attributes of judicial power" such as "de novo" review of "legal rulings."  *Commodity Futures Trading Comm'n* v. *Schor*, 478 U.S. 833, 852–53 (1986); *cf. Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 592–93 (1985) (Article III review allows administrative adjudication); *see also* Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 HARV. L. REV. 915, 939 (1988) ("Even if a case is tried in the first instance by a non-Article III tribunal, a separation-of-powers interest remains in ensuring appellate review by an Article III court.").

As recently explained in *Stern* v. *Marshall*, 131 S. Ct. 2594 (2011), a bankruptcy court's ability to enter binding, final judgments in "core" bankruptcy proceedings—like plan confirmation—is supposed to be subject to district court review on appeal "under traditional appellate standards." *Id*. at 2604.  Failure to do so will lead to gaming the system so that lower federal courts will routinely reject bankruptcy appeals based on "equitable mootness" and deny appellants' constitutional right for Article III review.  *See e.g. Ad Hoc Committee v. Delta Air Lines, Inc*., 2009 U.S. Briefs 104, U.S. S. Ct Briefs LEXIS 2649 (July 22, 2009) (challenging whether Article III courts can decline to review bankruptcy appeals that are not constitutionally moot under the judge-made doctrine of equitable mootness); *Spencer Ad Hoc Equity Committee v. Idearc, Inc*. (*In re Idearc, Inc*.), 2011 U.S. Briefs 874; 2012 U.S. S. Ct. Briefs LEXIS 229) (January 11, 2012) (challenging the constitutionality of the application of the equitable mootness); *Prime Healthcare Services Los Angeles, LLC v. Brotman Medical Center, Inc*., 2011 U.S. Briefs 459, 2011 U.S. S. Ct. Briefs LEXIS 1622 (October 11, 2011) (challenging constitutionality of equitable mootness doctrine).  As Justice Alito warned over ten years ago:

> For the reasons explained in my dissent in Continental Airlines, see *91 F.3d at 567-73*, however, I continue to disagree with the expansive version of the equitable mootness doctrine that our court adopted in that case, as well as with the abuse-of-discretion standard of review. *See id*. at 568 n.4 (Alito, J., dissenting).  As this case shows, <u>our court's equitable mootness</u>

> doctrine can easily be used as a weapon to prevent any
> appellate review of bankruptcy court orders confirming
> reorganization plans.  It thus places far too much power in the
> hands of bankruptcy judges.

*Nordhoff Investments, Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 192 (3d Cir. 2001) (J. Alito, concurring) (emphasis added).[10]

In this case, for example, the Debtor and the Plan Sponsor secured confirmation over strenuous objection that the Plan was illegal and did not comply with the Bankruptcy Code.  They then successfully opposed a stay pending appeal by arguing self-created potential harm and then rushed to consummate their Plan asserting that depriving them of the confirmed--but clearly improperly confirmed--Plan would be an injustice to them.  Quad should not so easily be denied its only opportunity for Article III review.

## B.    The Doctrine of Equitable Mootness Exceeds the Court's Judicial Functions

The Supreme Court in *Stern v. Marshall* reiterated the significance of separation of powers and the independent functions of the legislative, executive and judiciary branches of the federal government.

> In establishing the system of divided power in the Constitution,
> the Framers considered it essential that "the judiciary remain[ ]

---

[10] In his concurring opinion, Justice Alito explained that his primary reason for concurring in the majority's opinion upholding the district court's dismissal of an appeal of a confirmation order equitably moot, was the appellants' failure to seek a stay.

truly distinct from both the legislature and the executive." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton). As Hamilton put it, quoting Montesquieu, " 'there is no liberty if the power of judging be not separated from the legislative and executive powers.' " *Ibid.* (quoting 1 Montesquieu, Spirit of Laws 181).

We have recognized that the three branches are not hermetically sealed from one another, see *Nixon v. Administrator of General Services, 433 U.S. 425, 443, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977)*, but it remains true that Article III imposes some basic limitations that the other branches may not transgress. Those limitations serve two related purposes. "Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Bond v. United States, 564 U.S. ___, ___, 131 S. Ct. 2355, 180 L. Ed. 2d 269, 2011 U.S. LEXIS 4558, *20 (2011)*.

*Stern v. Marshall*, 131 S. Ct. 2594, 2608-2069 (2011).  Extending the doctrine of equitable mootness to this case would be a judicial incursion into legislative powers.

Congress has determined and explicitly legislated that absent a stay pending appeal, certain orders of the bankruptcy courts are not effected by an appeal.  This statutory mootness under the Bankruptcy Code legislated by Congress, reflects the public policy of affording finality to certain bankruptcy court orders.  For example, Section 363(m) of the Bankruptcy Code provides that:

> (m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under

> such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale
> or lease were stayed pending appeal.

11 U.S.C. § 363(m).   Section 364 of the Bankruptcy Code includes a similar

provision applicable to post-petition debtor-in-possession financing.   These

provisions were derived from former Bankruptcy Rule 805 providing that absent a

stay of "orders approving a sale of property or issuance of a certificate of

indebtedness" to good faith purchasers or holders were not affected by reversal or

modification on appeal.  *See In re Continental Airlines*, 91 F.3d at 569 and 569-

579 n. 5 and 6 (J. Alito, dissenting).   The Bankruptcy Code does not have similar

provisions limiting the effect of appeals on confirmation orders or requiring a stay.

     The absence in the Bankruptcy Code of any limitation, such as

Sections 363(m) and 364, limiting the affect of appeals on an order confirming a

plan is presumptively purposeful and an intentional decision by Congress.  *See e.g.*

*Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes

particular language in one section of a statute but omits it in another section of the

same Act, it is generally presumed that Congress acts intentionally and purposely

in the disparate inclusion and exclusion.").   Thus, the doctrine of equitable

mootness exceeds the proper function of the Federal Courts.  *See In re Johnson-*

*Allen*, 871 F.2d 421, 428 (3d Cir. 1989). ("[I]t is not the function of this court to

cure any perceived "defects" in that legislation.   That authority is granted to

Congress alone."); *c.f. In re Continental Airlines*, 91 F.3d 553, 570 (3d Cir. 1996) (J. Alito, dissenting) (the majority appeared to suggest that federal courts may create federal common law to fill gaps in to effectuate statutory provisions).

## POINT III
### THE DOCTRINE OF EQUITABLE MOOTNESS DOES NOT AS A MATTER OF LAW PRECLUDE REVIEW ON APPEAL OF SEVERABLE PLAN PROVISIONS, SUCH AS, THE RELEASES AND INJUNCTIONS IN THE DEBTOR'S PLAN.

The Third Circuit has determined that the doctrine of equitable mootness does not apply in cases where an appellant challenges certain aspects of confirmation, such as releases of third parties.  *See e.g. United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 228 (3d Cir. 2003) (court could "modify" the plan's "indemnity provision" and "the Plan otherwise would survive intact"); *W.R. Huff Asset Mgmt. Co. v. HSBC Bank USA (In re PWS Holding Corp.)*, 228 F.3d 224, 236 (3d Cir. 2000) ("The releases (or some of the releases) could be stricken from the plan without undoing other portions of it."). As a matter of law, the equitable mootness doctrine does not apply to Appellant's appeal of the Bankruptcy Court's approval of injunctions and releases in favor of third parties.

## POINT IV
## THE DEBTOR HAS NOT DEMONSTRATED THAT EQUITABLE MOOTNESS APPLIES TO THE APPEAL.

When determining whether a bankruptcy appeal is equitably moot, the Third Circuit considers:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*In re Continental Airlines,* 91 F.3d at 560. The Third Circuit's recent decision in *In re Philadelphia Newspapers* provides additional guidance on the application of the five factors. *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012).

### A.    Granting the Appeal will Not

Relying on a Third Circuit case from twelve years ago, the Debtor incorrectly states the law as requiring this Court to consider substantial consummation as the "foremost consideration" under the equitable mootness doctrine. Two years later, the Third Circuit clarified that that even more significant than substantial consummation is the court's consideration of "the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance." *In re Zenith Electronics Corp*., 329 F.2d at

344 (satisfying the definition of substantial consummation while "a first step in applying this factor, … is not sufficient").

Most recently in 2012, the Third Circuit reiterated that substantial consummation of a Chapter 11 plan alone, does not render an appeal equitably moot. *In re Philadelphia Newspapers*, 690 F.3d at 168. "The first factor, typically, 'the foremost consideration,' *id*., requires that a court consider whether allowing an appeal to go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition." *Id*. Thus, the size and complexity of the plan weigh heavily in the determination of the first factor of equitable mootness. *See generally In re Zenith Electronics Corp*., 329 F.2d at 344 n. 3 (The Third Circuit notes that in *In re Continental* the "fact that the Trustees' appeal might unravel this extremely complex reorganization plan, rather than the formal substantial confirmation [sic] of the plan, that led the Court to conclude that there were 'no prudential considerations that would support an attempt by an appellate court, district or court of appeals, to fashion even a limited remedy for the Trustees.'"). Finally, the fourth factor "considers whether granting the appellant the requested relief would unravel the plan," and is largely duplicative of the first factor. *In re Philadelphia Newspapers, LLC*, 690 F.3d at 169.

The Debtor's Plan has not been substantially consummated. The Debtor has not transferred all or substantially all of the property proposed by the Plan to be transferred. The Plan provides for creditors to be paid $1.25 million. To date, the Debtor has paid unsecured creditors less than $6,000 with the balance of approximately $34,000 being held in escrow pending the outcome of the Seventh Circuit Appeals. *See Akron v. Akron Thermal* (*In re Akron Thermal, L.P.*), 2009 U.S. Dist. Cr. Motions LEXIS 13274, Case no. 5:0-CV601, (D.Ct. N.D. Ohio April 20, 2009) (escrowing largest transfer from the Debtor under the Plan held substantial consummation of the plan in abeyance). In fact, until the Seventh Circuit Appeals are determined, the Debtor does not even know how much each unsecured creditor will receive under the Plan.

Further, the relief request on appeal will not unravel a complex plan on which third parties have relied. In considering this factor, courts consider whether the plan could be reversed without great difficulty and inequity. *See Nordhoff Invs., Inc.*, 258 F.3d at 186; *see also*, *Continental Airlines*, 91 F.3d at 567-568 (The debtor had entered into irrevocable transactions pursuant to the Plan.). Courts have most frequently determined that a plan could not be retracted when the reorganized debtor issued publically traded debt or securities. *See e.g. id; Adelphia Communications Corp*., 367 B.R. at 90; *SemCrude, L.P.*, 2012 WL 1836353. For example, in *In re Spansion*, the district court analogized the case to

25

*Nordhoff* in which the debtor had issued new stocks and publicly traded bonds, and entered into new credit facilities. *Ad Hoc Comm. of Convertible Noteholders v. Spansion, Inc.* (*In re Spansion, Inc.*), Nos. 10-369, 10-385, 2011 U.S. Dist. LEXIS 86152 (D. Del. Aug. 4, 2011). The district court concluded that the plan could not be unraveled without great difficulty and prejudice to investors and third parties. "[J]ust as the Third Circuit acknowledged in *Nordhoff* that unraveling a debt exchange is difficult when bonds are publicly traded, here, unraveling the Confirmed Plan is extremely difficult because the New Common Stock is actively traded on the NYSE." *Id* at p. *12.

The Reorganized Debtor did not issue any publicly traded securities or debt under the Plan or engage in any other unretractable transactions. The transfer of equity to the sole new member is merely a paper transaction that is easily reversed. This is not a publicly traded company. The Debtor has not made a public offering or issued thousands of shares of equity or debt pursuant to its Plan. The Debtor has the ability to return the $200,000 Sponsor Investment to the Plan Sponsor as it is equal to or less than the Debtor reportedly holds in cash on a monthly basis throughout the Bankruptcy Case.

Contrary to the Debtor's suggestion, reversal of the Confirmation Order would not require recovering "distributions" to creditors made under the Plan. (*See* Heverly Declaration at ¶ 18). First, the Reorganized Debtor itself

26

acknowledges that reversal of the Confirmation Order would only "<u>potentially</u> <u>implicate</u> the recovery of distributions . . . ." (*See id*.) (emphasis added). With respect to the Reorganized Debtor's payment of professional fees, the Debtor had been paying professional fees throughout the Bankruptcy Case as permitted under the Court's Interim Compensation Order. Unless and until the Bankruptcy Case was converted to Chapter 7 and the estate was administratively insolvent with respect to Chapter 7 fees, the Chapter 11 professional fees would not need to be recovered as professional fees would be paid prior to claims of other creditors. The same analysis applies to payment of holders of Section 503(b)(9) administrative claims. Thus, any need to recover "distributions" from professionals or other administrative creditors would be the result of conversion of the Bankruptcy Case to Chapter 7, not as a result of the relief requested on Appeal.

With respect to secured creditors, the Debtor was also paying these claims during the Bankruptcy Case and there is no legal or factual basis to claim that the Debtor would have to recover these funds. Similarly, a debtor-in-possession is <u>required</u> to pay United States Trustee's fees throughout the bankruptcy case and there is no reason that these fees would be recoverable.

Finally, with respect to payments to unsecured creditors, of the $40,000 purportedly paid to unsecured creditors, as set forth *supra*, over $34,000 is being held in escrow. Of the de minimis amount actually paid to unsecured

creditors, these creditors continue to conduct business with the Debtor and there is no reason that, if necessary, the Debtor could not setoff the minimal distributions to these creditors against post-petition obligations.

The Reorganized Debtor's reference to assumption of executory contracts and leases is misleading as the relief request on appeal will have no effect on the assumption because the Bankruptcy Court did not require the Debtor to cure pre-petition defaults under the agreements. Thus, there are no funds that would be recoverable. The Reorganized Debtor's reference to the releases in favor of third parties is also irrelevant as no actions were taken to effectuate the releases and no action need be taken to undo the releases.

## B.   **Appellant Diligently Pursued All Available Remedies.**

The Third Circuit has held that an appellant has the obligation to pursue all available remedies to obtain a stay "if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." *Nordhoff Investments, Inc. v. Zenith Electronics, Corp.*, 258 F.2d 180, 186-187 (3d Cir. 2001) (citation omitted). Thus, the first two factors recognize that if the confirmation order is stayed pending appeal, neither the debtor nor any other parties can take any actions to consummate the plan or on which third parties would rely prior to consideration of the merits of the appeal. *See In re Philadelphia Newspapers*, 690 F.3d at 168 (with respect to the second factor, the

Third Circuit noted that it "principally duplicates" the first factor because a plan cannot be substantially consummated if the confirmation order is stayed). The parties' status is effectively frozen at confirmation pending consideration of the appeal and equitable mootness will not apply.

Significantly, in most cases where the Third Circuit has determined that an appeal was equitably moot, the appellant never sought a stay pending appeal. *See, e.g.*, *Nordhoff Investments, Inc.*, 258 F.3d at 187; *but see*, *In re Continental Airlines*, 91 F.3d at 557 (appellants sought and were denied stay pending appeal because they did not post a bond satisfactory to the court); *Ad Hoc Committee of Convertible Noteholders v. Spansion, Inc.* (*In re Spansion, Inc.*), 2011 U.S. Dist. LEXIS 86152 (D. Del. 2011) (appeal equitably moot in case where appellants sought and were denied stay pending appeal).

There is no plausible argument that Appellant did not diligently pursue all of its remedies. Appellant previously sought a stay from both the Bankruptcy Court and this Court. Appellant appealed this Court's denial of a stay to the Third Circuit. The Third Circuit Court of Appeals dismissed the appeal for lack of jurisdiction. After the Debtor closed the transaction under the Plan, Appellant sought injunctive relief from this Court which was denied.

The Reorganized Debtor claims that Appellant did not avail itself of all possible remedies because it did not "avail itself of the 14-day stay granted by

the Bankruptcy Court."[11]  (*See* Brief at p. 19).  First, the Reorganized Debtor fails to acknowledge that Appellant moved for a stay pending appeal in the Bankruptcy Court even <u>prior</u> to the entry of the Confirmation Order to ensure that its rights would be protected if the Bankruptcy Court granted the Debtor's request to dispense with the 14-day automatic stay of a confirmation order.  Appellant then moved for a continued stay pending appeal <u>prior to the expiration</u> of the automatic 14-day stay in the District Court.  The Reorganized Debtor does not explain the relevancy of which day during the 14-day stay Appellant filed its motion for a continued stay.  Instead, the Reorganized Debtor cites to inapposite cases in which the aggrieved party did not seek a stay pending appeal.  *See e.g. MAC Panel Co. v. Va Panel Corp.*, 283 F.3d 623 F.3d 623 (4th Cir. 2002) (creditor did not appeal bankruptcy court's denial of stay or seek an independent stay from the district court or court of appeals).

The Reorganized Debtor also argues that seeking a stay without posting a bond is not sufficient citing Federal Rule of Bankruptcy Procedure 8005 and *In re Continental*.  The Reorganized Debtor incorrectly claims that Bankruptcy Rule 8005 requires a party moving for a stay to post a bond.  *See* Fed. R. Bankr. P. 8005 ("The district court or the bankruptcy appellate panel may condition the relief

---

[11] The Bankruptcy Court did not grant Appellant a 14-day stay as stated by the Reorganized Debtor—the 14-day stay is provided for under the Bankruptcy Rule 7062.

it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court."). On the contrary, Rule 8005 permits the court to condition a stay on the posting of a bond. For example, in *Continental*, the district court granted appellant's request for stay subject to a bond but the appellant was not willing to post the bond required by the district court to secure a stay. *See id*. at 562. In this case, neither the Bankruptcy Court nor this Court indicated that it would grant a stay subject to Appellant posting a bond. Further, unlike the *Continental* case, Appellant never expressed any unwillingness to post a bond. Finally, in all of the cases cited by the Debtor in which courts considered posting of a bond as a factor in equitable mootness the appellant had elected to forgo a stay granted by the court rather than post a bond. *See e.g. ACC Bondholder Group v. Adelphia Communications Corp*. (*In re Adelphia Communications Corp*.), 367 B.R. 84 (S.D.N.Y. 2007).

If an appellant seeks a stay of an order confirming a plan and it is denied, this factor should weigh against applying the equitable mootness doctrine. Otherwise, obtaining a stay would become a mandatory requirement prior to the consideration of the merits of an appeal of a confirmation order. In his dissenting opinion in *In re Continental Airlines, Inc*., then Third Circuit Judge, Justice Alito addressed the majority's consideration of the failure to seek or obtain a stay noting that neither the Bankruptcy Code nor Bankruptcy Rules required a stay when a

party appeals confirmation.  91 F.3d 553, 570 (3d Cir. 1996) (J. Alito, dissenting).

Justice Alito also noted that the Third Circuit had already rejected interpreting

mootness principles to require a stay because only two provisions of the

Bankruptcy Code (Sections 363(m) and 364(e)) explicitly require a party to seek a

stay pending appeal.  *In re Continental*, 91 F.3d at 572.  Finally, Justice Alito

concluded that the purpose of a stay, namely, "to prevent transactions that might

otherwise occur in reliance on the plan . . . and be difficult to undo if the appeal

were to succeed" might justify limiting the relief available to a party who did not

obtain a stay if successful on appeal, but it could not justify refusing to consider

the merits of the appeal. *Id*.

## C.    No Third Parties have Relied on Confirmation

The third factor considers third party reliance during the pendency of

the appeal.  *In re Philadelphia Newspapers, LLC*, 690 F.3d at 169 (the third factor

addresses "to what extent the relief sought [on appeal] would adversely affect

parties not before the court.").   The Debtor does not explain how the relief

requested on appeal would effect any third parties that were not involved in the

Bankruptcy Case.  If the Confirmation Order were reversed, the Debtor would

continue to operate its business as a debtor-in-possession in Chapter 11.

Consequently, the relief requested would have no effect on the ordinary course

transactions the Debtor claims to have entered into in reliance on the Confirmation

Order.  This is not a case where a debtor issued publicly traded securities or debt pursuant to a plan that third parties to the bankruptcy case could have purchased on the open market.

### D.     The Policy of Preserving a Party's Right to Appeal Should Trump the Finality of Bankruptcy Judgments

The fifth factor, affording finality to bankruptcy judgments, is also guided by reliance of third parties and the difficultly of unscrambling a confirmed plan.  *In re Philadelphia Newspapers, LLC*, 690 F.3d at 169.  For example, in *In re Philadelphia News*, the Third Circuit determined that it would disturb the finality of the bankruptcy court's decision because the limited appeal would not unscramble the plan or upset rights of third parties.    Consequently, the *Philadelphia News* Court stated that it would "honor the [Appellant's] statutory right to review of the Court's decision."  *Id*. at 171.

In this case, the Debtor cannot point to any third party that relied on the Plan and would be adversely effected or, effected at all, by the relief requested. The Debtor's speculation of adverse effects on third parties pertain not to the relief requested on appeal but if the Bankruptcy Case was later converted to Chapter 7. Harm arising from a Chapter 7 conversion is not the consideration before this Court or the relief requested in the appeal.  Considering the absence of any evidence of reliance on third parties whose rights would be effected coupled with the constitutional infirmities of the doctrine of equitable mootness, the policy of

affording finality to bankruptcy judgments should not trump the policy of preserving a party's right to appeal.

**POINT V**
**THE COURT SHOULD STRIKE THE DECLARATION OF BRUCE HEVERLY AND NOT CONSIDER IT IN SUPPORT OF THE DEBTOR'S MOTION**

In support of its Motion, the Debtor offers nothing more than speculation and vague generalizations of the CEO of the Reorganized Debtor. (*See* Declaration of Bruce Heverly in Support of Reorganized Debtor's Motion to Dismiss Appeals as Equitably Moot (the "Heverly Declaration")). The Heverly Declaration is not based on facts or other admissible evidence, instead it is replete with speculation, opinion and other inadmissible comments. (*See* Heverly Declaration) ("would <u>potentially</u> implicate" (¶ 18); "I have no reason to <u>believe</u>" (¶ 19); "<u>could</u> dramatically impact" (¶20); "<u>could</u> cause profound economic harm," (¶ 21); "would <u>likely</u> prejudice and create considerable uncertainty," (¶ 22); "I <u>believe</u> that granting the . . . relief would potentially jeopardize . . . " (¶ 23); "<u>likely</u> litigation" (¶ 23); "it is my <u>view</u> that granting the relief" (¶ 24)) (emphasis added).

To the extent that the Heverly Declaration contains facts to which Heverly is competent to testify, Heverly is not credible. Heverly falsely states under penalty of perjury in the Heverly Declaration that "no other party . . . even made a written proposal for the Reorganized Debtor . . . ." (*See* Heverly Declaration at ¶ 19). Not only did the Debtor have another written offer that it

failed to disclose and Heverly affirmatively misrepresents in the Heverly Declaration did not exist, the written offer would have resulted in more funds available to creditors, albeit less of a salary for Heverly and his wife. (*See* Schael Certification at Exhibit B).  Further, Heverly refers to agreements in the Heverly Declaration yet these purported agreements are not included with the Heverly Declaration.[12]  Thus, Heverly's "testimony" in the Heverly Declaration is not credible or corroborated by any other evidence.  For all of the foregoing reasons, the Court should strike the Heverly Declaration and deny the Debtor's Motion.

## CONCLUSION

WHEREFORE, Appellant respectfully requests that the Court strike the Heverly Declaration, deny the Debtor's Motion to Dismiss the Appeals as Equitably Moot, and grant such other and further relief to Appellant as the Court deems appropriate.

Dated: June 14, 2013        ASHFORD SCHAEL LLC
Counsel for Quad/Graphics, Inc.
By:   /s/ Courtney A. Schael
Courtney A. Schael (CAS-1295)
Counsel for Quad/Graphics, Inc.

GODFREY & KAHN, S.C.
Counsel for Quad/Graphics, Inc.
Timothy F. Nixon, Esq. (WI Bar No. 1013753)

---

[12] Further, because the Reorganized Debtor has failed to file post-confirmation operating reports required by the United States Trustee, Appellant can not confirm the amounts alleged paid under the Plan.